SHELL PETROLEUM CORP. et al. v. VOSS et ux.

No. 29235.   Feb. 3, 1942.

Rehearing Denied June 9, 1942.

*126 P. 2d 540.*

W. M. Bowles, of Perry, Paxton Howard, Ralph J. May, W. D. Simms, Edward H. Chandler, Robert L. Imler, Donald Campbell, Victor C. Mieher, John R. Ramsey, and Warren D. Abbott, all of Tulsa, for plaintiffs in error.

Cress & Cress and Henry S. Johnston, all of Perry, for defendants in error.

BAYLESS, J.   William H. Voss and Flora Voss, his wife, filed an action in the district court of Noble county, against Shell Petroleum Corporation et al. to recover damages for the permanent injuries to land, for certain expenses incurred in drilling for water, and for the loss of a filly; and the defendants appeal from a judgment, based on the verdict of the jury, in favor of plaintiffs.

The plaintiffs own a quarter section of land that is bisected by Black Bear creek meandering across the farm, generally along the north line of the south 80. This creek has been polluted by salt water escaping from near-by oil fields since 1925, and defendant companies operate leases in those fields, and no issue is made before us as to their part in the pollution of the creek. In 1927, these plaintiffs sued several companies, some of whom are defendants herein, to recover damages for certain permanent and temporary injuries to this land; and, in 1929, this action was settled by agreement and dismissed on order of the court with prejudice. A covenant not to sue the companies again within a ten-year period was executed by the plaintiffs, and this period expired in 1935. The present action is to recover damages that have been occasioned by injuries done since the expiration of the ten-year period.

Defendants first contend that the order of dismissal in the prior action is res adjudicata to plaintiffs' present cause of action insofar as it relates to permanent injuries to the land. This is the same contention that was made and disposed of in the case of Shell Pet. Corp. v. Hess, 190 Okla. 669, 126 P. 2d 534, this day decided, involving an almost identical fact situation. What

we said in that decision in declining to apply the rule of res adjudicata to that case applies here. We pass this point by in order that we may consider other assignments.

There are two propositions that relate to the damages claimed for the land, and we now consider them together. It is contended that the burden of proof is on the plaintiffs to show by competent evidence that the thing they complain of is capable of producing the injuries pleaded, and that the uncontradicted evidence fails to disclose a causal connection between the injuries complained of and the alleged acts of negligence of the defendants.

As stated before, we must begin the consideration of this matter with the knowledge that this creek had been polluted for many years. The proof herein discloses that beginning about 1930, the creek began to clear up, and by 1933 or 1934, was again usable to some extent. About 1935, it suddenly was polluted again by salt water, and remained so thereafter. We have carefully considered the evidence on that point and the plaintiffs' contentions regarding the degree of decrease of pollution and the corresponding increase in usability, and while it parallels to a marked degree the evidence in Shell Pet. Corp. v. Kent, 187 Okla. 637, 105 P. 2d 230, we are unable to say that plaintiffs herein rely upon the repollution of the creek as creating a new injury as was the contention in the Kent Case. In the Kent Case it was contended that the creek had cleared up to the extent of being usable and safe for cattle, whereby a new right of use arose which was thereafter destroyed by repollution to Kent's new injury and damage. In this case there is considerable evidence relating to the decrease in degree of pollution up to 1935, and the subsequent increase of pollution, so that in 1937, 1938, the creek was again nearly as badly polluted as it ever had been. But plaintiffs herein make it clear that at all times they kept their cattle fenced away from the creek, and showed that such of their animals as evaded their guard and drank from the creek died

after drinking therefrom, from which we understand that they are not now asserting that the creek ever became usable and was again rendered unusable by the increased pollution. The plaintiffs in the Kent, Hess, and Voss Cases lived within relatively short distances of each other, and used many of the same persons as witnesses in each case, but their contentions seem to us to differ, and this difference accounts for the conclusions reached in the cases.

In this case the plaintiffs alleged and introduced proof to show that beginning in 1935, there was an increase in the salt water content of this creek, and that beginning in that year more and more timber adjacent to and along the creek died, and that all of the vegetation died; that the creek banks were softened and loosened by the loss of natural vegetation, shrubbery, and roots of trees, and by the deteriorating effects of salt water by reason of which they sloughed away and widened the creek channel; and water wells drilled near the house and barn became foul and unfit for use. It is sufficient to say that plaintiffs introduced ample proof of the loss of timber, the loss of vegetation and shrubbery, the sloughing away of the creek banks, and the depositing of salt water on the surface of the land subject to overflow which, after evaporation, left crystals of salt visible. In no instance did plaintiffs' witnesses undertake to say what caused the trees, vegetation, and shrubbery to die, or the creek banks to slough away. The trial judge constantly ruled that these witnesses had not qualified to undertake to give their opinions as to the cause, and that their testimony was limited to conditions that they observed.

The defendants attempted to controvert plaintiffs' evidence on the issue of decreased or increased pollution, and whether the creek banks had actually sloughed away more than was normally to be expected. In this respect, we cannot undertake to weigh the evidence, for it is in conflict, and if the jury's verdict is otherwise sustainable, it must be allowed to stand on this issue.

However, defendants by cross-examining plaintiffs' witnesses made it abundantly clear that there was much dead timber all over plaintiffs' farm; that there were live and dead trees in the same general places all over the farm, both on the overflow land and the high ground; and that vegetation was growing close to the banks of the creek, although they differed with defendants' witness whether this was a natural, valuable growth or simply a valueless, wild growth that would appear under unfavorable circumstances. In this respect, defendants were preparing a predicate to show that salt water pollution was not the cause of the death of the timber on the overflow land, for timber died on land that was not subject to overflow.

Defendants used two expert witnesses, one a forestry expert and one a chemist specializing in geology and chemistry of soils. Without reciting all of the facts upon which the forestry expert based his opinion, he gave an opinion that the timber died as the result of drouth and the attacks of insects. He also examined the banks of the creek, and gave as his opinion for the cause of the sloughing away thereof the cutting effect of the water. Plaintiffs' proof was that there had been two very high floods in 1937 and 1938, and that the sloughing away of the creek banks was worse during and following these floods. The chemist took samples of soil from various places and depths on the farm, and analyzed them. His analysis showed no more salt content than is average in soil of that type, and it was only one-twentieth part of the minimum amount necessary per acre to affect the utility of soil. He also examined the trees, and stated that in his opinion they died from the effects of drouth and insects and not from the effects of salt water pollution. The parties stipulated with respect to the testimony of a chemist who analyzed samples of water taken from the creek. He placed the salt content of the creek at only 1,048 per million. It is known that salinity of 1,000 per million is negligible; and that salt only becomes harmful to vegetation when it approaches 4,000 per million. See Shell Pet. Corp. v. Worley, 185 Okla. 265, 91 P. 2d 679.

As pointed out in the Worley Case, water in a creek that has a negligible saline content during normal flow, that is swept out onto the adjacent land by flood waters, is obviously so diluted that its saline content is many times less. Water that in normal flow contains only 1,048 parts per million of salt is only 48 parts per million above the known negligible and unharmful state and is more than 2,000 parts below the known injurious minimum level, insofar as timber, grasses, and natural vegetation are concerned; and, when floods greatly dilute this 1,048 parts per million, the decrease that follows is a reasonably certain fact. We think this is clearly demonstrated by the testimony of the soil chemist's tests. The saline content of the soil examined did not exceed the amount that normally would be found in such soil, thus demonstrating that if water containing, in all, 1,048 parts per million of salt was periodically deposited on this land, it had not deposited enough salt thereon to raise the salt content of the soil above normal. The salt content of this land, according to the analysis, was only one-twentieth part of that which is harmful. In other words, it amounted to 50 pounds per acre, whereas the testimony of the soil chemist is that it would require 1,000 pounds per acre to affect the fertility of the soil.

We treat the issue of the unfitness of the water wells separately from the other claims. The plaintiffs' evidence showed that these wells were drilled to various depths on locations higher than the creek bed. Shortly thereafter the water thereof became foul and stank and was unfit for use. Plaintiffs sent samples of the water away for analysis, and testified that the report of the analysis was that the water was polluted. The court did not permit them to go farther than this, and they did not introduce the report of the analysis to show in what manner the water was polluted. The stipulated analysis of the

chemist, witness for defendants, showed salt content of only 31 parts per million, a wholly negligible quantity. The soil chemist testified that there was a stratum of impervious clay between the depth of the wells and the creek bed level, and gave as his opinion that salt water could not penetrate into the wells from that source and that the small salt content of the soil analyzed indicated that it did not sink into the wells from above.

Considering all of this evidence, we are of the opinion that the contentions of the defendants are well taken, and that plaintiffs have wholly failed to show that the increased pollution of the creek after 1935 could have caused the injuries complained of, or that such increased pollution in fact did so injure their land as alleged.

We next consider the issue relating to the death of a filly. The testimony of plaintiffs is that this animal was about four years old, that she was fat, sleek, in the prime of condition and worth $250. This animal had never been sick, and was on feed and pasture, and in a good physical condition. The plaintiffs testified they kept her fenced away from the creek. The veterinarian testified that Mr. Voss told him the animal had access to the creek at all times and could drink its water as she pleased. Under our rule in Eagle-Picher Lead Co. v. Black, 164 Okla. 67, 22 P. 2d 907, and other cases, this relation of the symptoms given to the veterinarian was admissible as showing that he took into consideration, but could not of itself furnish independent proof of the facts related. Since the plaintiffs flatly contradicted these statements, and showed that the animal was kept away from the creek and only gained access to it on the occasion of her death, we must ignore the statement of the veterinarian for any purposes other than those for which it was admissible. Plaintiffs' evidence is that on a day certain a gate was left open by third parties and the filly ran to the creek, drank of its water, laid down therein and wallowed,

and was driven into the pasture. Shortly thereafter she became ill, and the veterinarian was called. He examined the animal and inquired of her keep and care. He testified she was in a dying condition, and she did thereafter die. When asked whether salt water caused her death, he answered that he could not say. He said her symptoms were similar to the effects of salt water, and that they also resembled other conditions. When asked to relate the effect of salt water on animals generally, he testified that the continued use of it would cause chronic indigestion, and animals would lose weight, their hair would turn, and they would gradually depreciate. This was the direct opposite of the condition he was confronted with. This animal showed none of these symptoms, but the contrary. He was examining an animal that drank this creek water within a few hours before he saw her, and insofar as this record is concerned, drank it only once; and he was unwilling to say that this produced death. Since this related to an issue that needed the testimony of expert and skilled professional men such as this veterinarian, and since he was unwilling to say that the drinking of this water was the cause of the animal's death, we must take the issue as not having been proved.

We have before us a voluminous record, containing the testimony of many witnesses. Much of it is irrelevant, except for the purposes of showing a general condition along the creek and of corroboration. Much of it, even by plaintiffs' witnesses, is contradictory; but, when it is all read and considered in the light of plaintiffs' contention of injuries to his land and personal property since 1935, when his covenant not to sue expired, we must hold that it is insufficient. Many cases have been before this court involving the pollution of this creek and its resultant effects upon the riparian owners, and the contentions of the various owners with respect to the condition of the creek and its effect upon them respectively show that each case must be decided upon its record and peculiar facts. We observe

also that the defendants in these cases are usually the same and some of the attorneys have participated in one or more of the cases, and the general fact situation with respect to the condition of the creek and its effect upon the lands are similar, yet the contentions of the defendants in their briefs before this court are not the same. Thus the apparently dissimilar decisions in these various cases, analogous as though they may appear to be in fact basis as pointed out, are dissimilar in conclusion because of the contentions raised and the records made.

The judgment of the trial court is reversed, and the cause is remanded for further proceedings not inconsistent with the views herein expressed.

WELCH, C. J., CORN, V. C. J., and RILEY, OSBORN, GIBSON, and HURST, JJ., concur. ARNOLD, J., dissents. DAVISON, J., absent.

---

ARNOLD, J. (dissenting). The testimony in this case, on the part of the plaintiffs, is substantially the same as the testimony offered in Shell Petroleum Corporation et al. v. Hess, 190 Okla. 669, 126 P. 2d 534, promulgated February 3, 1942. (See my statement of facts in the dissenting opinion.) However, in this case the defendants offered testimony undertaking to show that none of the injuries complained of by the plaintiffs were caused by additional pollution occurring after the expiration of the settlement (Oct. 1, 1935), or that said injuries were caused by other distinct and independent causes over which the defendants had no control. The defendants by reason of their testimony make a much closer question as to whether there is sufficient competent evidence on the part of the plaintiffs to submit the question to the jury.

The trial court and the jury, that heard and saw the witnesses, both for the plaintiffs and defendants, observed their demeanor and had a much better opportunity of appraising the weight and credit that should be accorded their testimony and the credibility thereof, evidently thought the plaintiffs were entitled to recover. This question, in my judgment, being a very close one, I am constrained to the thought that the record discloses sufficient competent testimony to warrant the submission of the questions of fact to the jury. The jury's judgment in the matter was approved by the trial court, and I am obliged to approve their judgment. I, therefore, respectfully dissent.